[Cite as *City Rentals, Inc. v. Kesler*, 191 Ohio App.3d 474, 2010-Ohio-6264.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## DEFIANCE COUNTY

CITY RENTALS, INC. et al.,

    APPELLANTS,

    v.

KESLER,

    APPELLEE.

CASE NO. 4-10-08

O P I N I O N

Appeal from Defiance Municipal Court
Trial Court No. CI09-591

Judgment Affirmed

Date of Decision: December 20, 2010

APPEARANCES:

    **Timothy C. Holtsberry**, for appellants.

    **Elizabeth J. Schuller**, for appellee

**PRESTON, Judge.**

{¶ 1} Plaintiffs-appellants, City Rentals, Inc., and E.J. Zeller, Inc. (collectively, "City Rentals"), appeal the judgment of the Defiance County Municipal Court dismissing City Rentals' case against Rodney Kesler. For the reasons that follow, we affirm.

{¶ 2} In the fall of 2008, City Rentals discovered that its former bookkeeper, Robin Bauer, had embezzled several hundred thousand dollars from the company. On July 29, 2009, Bauer was convicted in a separate criminal case and ordered to pay $200,000 in restitution to City Rentals.

{¶ 3} During the commission of the criminal offense, Bauer forged several checks drawn on City Rentals' bank account and issued them to various people including Kesler. Kesler described Bauer as a neighbor and family friend whom he had known for over 30 years. Kesler also explained that between 2005 and 2007, he had lent money to Bauer on several occasions in the form of personal loans. Between June 2007 and July 2008, Bauer repaid some of the money she owed to Kesler by directly depositing checks into his bank account or making payments on his commercial and mortgage loans serviced by the bank. Kesler admitted giving Bauer permission over the phone to make each deposit or payment.

{¶ 4} However, Kesler stated that unbeknownst to him at the time, Bauer made these deposits and payments using City Rentals' checks. Kesler explained that he never saw or endorsed the checks Bauer deposited into his account, and he further denied having any knowledge that the checks used by Bauer had been paid from City Rentals' funds. Kesler maintained that he became aware of Bauer's wrongdoing only when the police questioned him about the checks in the fall of 2008 during their investigation of Bauer. Kesler was never charged in connection with Bauer's crime.

{¶ 5} City Rentals claimed that Bauer was not authorized to write the checks to Kesler. In addition, it is undisputed by the parties that Kesler never provided any goods or services to City Rentals. After becoming aware of Bauer's embezzlement, City Rentals notified Kesler that Bauer had forged the checks issued to him and demanded that he return the funds. Kesler refused City Rentals' demands.

{¶ 6} City Rentals subsequently filed this action in the Defiance County Municipal Court, alleging that Kesler's retention of the funds constituted unjust enrichment. Kesler submitted his answer denying City Rentals' allegation. On March 10, 2010, City Rentals filed a motion for summary judgment. On April 10, 2010, Kesler also filed a motion for summary judgment. In his motion for summary judgment, Kesler asserted that the Uniform Commercial Code ( "UCC"),

governed this case because Bauer had paid him with checks, which are negotiable instruments. Kesler maintained that because he received the checks as payment on an antecedent debt he was a holder in due course under the relevant provisions of the UCC and therefore was under no obligation to return the funds to City Rentals.

{¶ 7} The trial court subsequently overruled both parties' motions for summary judgment and stated that two genuine issues of material fact remained: (1) whether Kesler "had no knowledge of [City Rentals'] checks being deposited into his accounts and (2) the amount of [City Rentals'] funds received by [Kesler]."

{¶ 8} Prior to trial, the parties stipulated that Bauer deposited $13,420 of City Rentals' money into Kesler's accounts. On May 20, 2010, the court conducted a bench trial. The only witnesses to testify were Kesler and his wife. On June 10, 2010, the trial court issued its decision granting judgment in favor of Kesler and dismissing City Rentals' case. In rendering its decision, the trial court concluded that the UCC, and not common-law principles, governed this case. The trial court further stated that it was "convinced that Defendant Kesler had no knowledge of Robin Bauer using money embezzled from the Plaintiffs." The trial court then concluded:

> With the evidence presented to the Court, case law mandates that Plaintiffs' case be dismissed, the Defendant having received payment of an antecedent debt in good faith without knowledge of the funds having been embezzled by the payer [sic].

This is not to say that Plaintiffs don't have further recourse as to the return of their money, as the Defiance County Common Pleas Court has already ordered the repayment of the money embezzled by their former employee.

{¶ 9} On June 29, 2010, City Rentals filed its notice of appeal and submitted the following three assignments of error for our review.

ASSIGNMENT OF ERROR NO. I
The trial court erred as a matter of law denying the plaintiffs' motion for summary judgment as there were no material facts at issue and judgment was a matter of law.

{¶ 10} In its first assignment of error, City Rentals argues that the trial court erred in denying its motion for summary judgment. Specifically, City Rentals contends that the court erred when it found that genuine issues of material fact remained that warranted the denial of City Rentals' motion for summary judgment.

{¶ 11} Generally, an appellate court reviews a lower court's decision to deny summary judgment de novo. *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243. Summary judgment is proper where there is no genuine issue of material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can reach but one conclusion when viewing the evidence in favor of the nonmoving party, and the conclusion is adverse to the nonmoving party. Civ.R. 56(C); *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.* (1994), 69 Ohio St.3d 217, 219, 631 N.E.2d 150. De novo review is independent

and without deference to the trial court's judgment. *Monroeville v. Wheeling & Lake Erie Ry. Co.*, 152 Ohio App.3d 24, 2003-Ohio-1420, 786 N.E.2d 504, ¶ 9 See also *Graham v. Drydock* Coal Co. (1996), 76 Ohio St.3d 311, 313, 667 N.E.2d 949.

{¶ 12} In order to prove its claim for unjust enrichment City Rentals had to demonstrate that (1) it conferred a benefit upon Kesler, (2) Kesler had knowledge of the benefit, and (3) Kesler had retained the benefit under circumstances where it would be unjust to do so without payment. *Hambleton v. R.G. Barry Corp.* (1984), 12 Ohio St.3d 179, 183, 465 N.E.2d 1298. Specifically, at issue in this assignment of error is whether a genuine issue of material fact remained as to the second element—whether Kesler knew that Bauer was depositing City Rentals' checks into his account. City Rentals maintains that the trial court misconstrued the knowledge requirement necessary to prove an unjust-enrichment claim when it found that a genuine issue of material fact remained regarding this element. However, after reviewing the evidence before the court in favor of Kesler, as the nonmoving party, we find that the record supported the trial court's determination that summary judgment in this case was inappropriate.

{¶ 13} Moreover, even assuming arguendo that we find error in the trial court's determination that a genuine issue of material fact remained, the error is harmless and does not rise to the level of reversible error under these

circumstances. The Supreme Court of Ohio has previously held that "any error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made." *Continental Ins. Co. v. Whittington* (1994), 71 Ohio St.3d 150, 156, 642 N.E.2d 615. Here, the trial court conducted a bench trial on the same issues raised by City Rentals in its motion for summary judgment. The evidence adduced at trial demonstrated that there were genuine issues of material fact supporting judgment in favor of Kesler on City Rentals' claim for unjust enrichment.

{¶ 14} Accordingly, for the reasons stated above, City Rentals' first assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. II
The trial court erred in the dismissal of the plaintiffs' case as
the decision was against the manifest weight of the evidence.

{¶ 15} In its second assignment of error, City Rentals contends that the trial court's decision to dismiss its claim for unjust enrichment was against the manifest weight of the evidence. In raising this assignment of error, City Rentals appears to incorporate essentially the same argument from the previous assignment of error that the trial court misconstrued the second element of unjust enrichment. Specifically, this element requires a showing that Kesler had knowledge of a

benefit conferred upon him by City Rentals. City Rentals maintains that Kesler's testimony demonstrated that he developed the requisite knowledge that City Rentals had conferred a benefit to him when the police informed him of Bauer's embezzlement.

{¶ 16} A civil judgment "supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus. "[W]hen reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the trier of fact are correct." *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24, citing *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273. The rationale for this presumption is that the trial court is in the best position to evaluate the evidence by viewing witnesses and observing their demeanor, voice inflection, and gestures. *Seasons Coal Co. v. Cleveland* at 80. "A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." Id. at 81.

{¶ 17} Although the trial court did not explicitly indicate that it relied on the UCC in rendering its decision, it is apparent that it followed the UCC doctrine of holder in due course in making its ruling. In particular, the trial court in its judgment entry dismissing City Rentals' case quoted at length from *Hinkle v. Cornwell Quality Tool Co.* (1987), 40 Ohio App.3d 162, 532 N.E.2d 772. In *Hinkle*, the Ninth District Court of Appeals held that "only bad faith on the part of a third person receiving stolen money or his failure to pay valuable consideration therefor, will defeat his title thereto as against the true owner. Money and bank notes are the exception to the general rule that no one can obtain title to stolen property. A holder in due course of a stolen negotiable instrument can receive good title thereto and is subject only to the defense that he was a party to the theft." (Citations omitted.) Id. at 166-167.

{¶ 18} Despite City Rentals' contentions that the common law should control this case, we believe the trial court correctly determined that the facts of this case fall under the province of the UCC. The payments at issue were made by eight checks written on City Rentals' account. Checks are negotiable instruments falling within the scope of the UCC, which is codified in R.C. Chapter 13. See R.C. 1303.02 (stating that R.C. Chapter 13 applies to negotiable instruments) and 1303.03(F)(1) (defining a check as a negotiable instrument that is a draft payable on demand and drawn on a bank). R.C. 1301.03 further provides:

> Unless displaced by the particular provisions of Chapters 1301., 1302., 1303., 1304., 1305., 1307., 1308., 1309., and 1310. of the Revised Code, the principals of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement their provisions.

Moreover, "when the Ohio General Assembly has codified the law on a subject, the statute governs to the exclusion of the common law, unless there is clear legislative intent that the statutory provisions are merely duplicative. * * * There is nothing in the Uniform Commercial Code which indicates that the Ohio General Assembly intended its provisions to be duplicative of the common law it supplanted." *Baggott v. Piper Aircraft Corp.* (S.D.Ohio 1999), 101 F.Supp.2d 556, 561; see *Amzee Corp. v. Comerica Bank-Midwest*, 10th Dist. No. 01AP-465, 2002-Ohio-3084, ¶ 46 (finding that where a company's employee forged company checks to pay her personal charge account at a bank, the company could not sue the bank on common-law claims for conversion, negligence, and unjust enrichment because the UCC governed the transaction).

{¶ 19} Having concluded that the provisions of the UCC govern the parties' rights and responsibilities in this case, we must next determine whether the trial court's decision to dismiss City Rentals' claim for unjust enrichment was supported by some competent, credible evidence. Implicit in the trial court's ruling is its determination that Kesler was a holder in due course and, therefore,

not subject to City Rentals' claim for unjust enrichment. Generally speaking, a holder in due course takes an instrument, in this instance a check, free from all claims and defenses with certain limited exceptions. *All Am. Fin. Co. v. Pugh Shows, Inc.* (1987), 30 Ohio St.3d 130, 131-132, 507 N.E.2d 1134. A person who is not a holder in due course takes the instrument subject to all valid claims, defenses available in an action on a simple contract, claims in recoupment, and certain other specified defenses. Id.; see also R.C. 1303.35 (listing the claims and defenses in recoupment).

{¶ 20} In order to qualify as a holder in due course, a person must meet all the statutory requirements. *Arcanum Natl. Bank v. Hessler* (1982), 69 Ohio St.2d 549, 552, 433 N.E.2d 204. "Under UCC 3-302, a holder becomes a holder in due course if the holder takes the instrument (1) for value, (2) in good faith, (3) and without notice of any claims or defenses otherwise available to the person obligated on the instrument or various defects in the instrument." *Dice v. White Family Cos., Inc.*, 173 Ohio App.3d 472, 2007-Ohio-5755, 878 N.E.2d 1105, ¶ 27, citing R.C. 1303.32(A)(2).

{¶ 21} At trial, Kesler testified that he had known Bauer for over 30 years. Kesler explained that he and Bauer were raised in the same town, went to the same primary and secondary schools, and had been neighbors at one point. Kesler

testified that his family and Bauer's family spent time together on several occasions because their children were roughly the same ages.

**{¶ 22}** Kesler recalled that the first time Bauer came to him asking to borrow money, the amount was only $500. Kesler stated that Bauer repaid him in cash a few weeks later. Kesler then described other specific instances in which he lent Bauer money for her son's graduation party and to buy a car for her oldest daughter. Kesler maintained that in each instance the loan amount was somewhere between $500 to $1,100. Kesler testified that the largest amount he lent to Bauer at one time was $5,000, which Bauer needed in order to get a divorce. Kesler admitted that their arrangement remained informal and was never reduced to writing.

**{¶ 23}** Kesler testified that he did not hesitate in lending Bauer money because he was aware that she was going through a difficult time with her marriage and, based on the first few instances when he had lent her money, he trusted that Bauer would promptly repay him. Kesler stated that Bauer had established a course of conduct in which she would repay him in person with either cash or a check written on her personal checking account.

**{¶ 24}** Kesler recalled that after he had lent Bauer some of the larger amounts of money in the spring of 2007, she became less prompt with repayment. Kesler described specific instances in which he resorted to calling Bauer asking

for some of his money. The following is an excerpt from Kesler's testimony at trial:

> Q: And so you had some discussion about, "When are you going to pay me?"
>
> A: Yes. As a matter of fact, one time, I had to, I got pretty verbal, that I needed my money. Me and my wife were going to do something, some other business, and I had to have my money. And that time she put one of the larger amounts, I don't remember the date of the check, but one time she put one of the larger amounts into the Huntington checking account. Because I went to the Huntington Bank to make sure that she did, before I left town.
>
> Q: But you would just, after these conversations, direct her where to put the checks, or where to pay?
>
> A: Right.
>
> Q: You would say, "Just take it down to First Federal and put it into my checking account."
>
> A: Yes.
>
> Q: And then—
>
> A: She would call me first, and say, "Hey, I have X amount," whatever that, say if it was Eleven Hundred Dollars, "I have the Eleven Hundred Dollars, Rodney," and, "What do you want me to do with this?"
>
> Q: Okay.
>
> A: Because sometimes, I wanted my money right then, and a couple of times I drove back to Defiance, you know, prior to all this. And then I said, "Hey, just run it up to the bank and put it into my checking account." My name is the only one on the checking account, so at First Federal, and that is when it first started, her going and putting something into my account.

Q:     And then, the times you would run back into Defiance to get the money, would she have paid you cash?

A:     Yes.  That or, there were a couple times when she gave me a personal check from her account.

Q:     And then you'd check online?

A:     Yes.

Q:     Your online banking statement doesn't have any images, imaging, of the checks that are deposited, or anything of that nature?

A:     No, the only images it has are just my personal checks that come back to the bank.

Q:     Okay, just opposed to sending you a bank statement, then, you can get online and see your checks that cleared?

A:     Yes.

Q:     So you can reconcile your checkbook?

A:     Right.  Correct.

Q:     But as far as deposits, it wouldn't show you a deposit slip and, like, a list of checks or currency that was deposited?

A:     No, it just had, just a deposit, and like a slash mark, and then a date, and an amount.  I believe it was about like the statements.  That statement there has—

Q:     Okay, So how would you keep track of the loan amounts, then?

A:     Like I said, if I loaned her Five Hundred Dollars, for instance, she pulled back in my driveway and paid me Five Hundred Dollars back.  So then she didn't owe me anything

anymore, of course. You know, the next time she wanted to borrow some money, say it was one of the Eleven Hundred Dollar ones, she would come, and I would loan her the money, and within a few weeks, or sometimes a month, she would pay me back. Like I said I never got, or let it get out of control, or it never went a large amount of time, or it never went over the amount of the largest that we had loaned her.

Q: And that was the Five Thousand Dollars?

A: The Five Thousand Dollars.

{¶ 25} Kesler maintained that when he was able to meet with Bauer she would pay him in cash or with a personal check. It was only on the occasions that he did not personally meet with Bauer that she repaid him by directly depositing the checks into his accounts.

{¶ 26} Kesler revealed that he was notified of Bauer's wrongdoing several months after Bauer's last repayment when the police questioned him during their investigation of Bauer. Kesler denied having any knowledge that Bauer had used City Rentals' checks to make repayment to him.

{¶ 27} Kesler's wife, Melinda, was the only other witness to testify. Melinda described her relationship with Bauer as "just friendly neighbors." Melinda stated that she knew that Kesler had lent money to Bauer. Melinda expressed empathy for Bauer's poor marital situation and stated that she felt sorry for Bauer's children. Melinda further stated that she trusted that Bauer would repay them.

{¶ 28} Based on the testimony elicited at trial, we find that the judgment of the trial court was supported by some competent, credible evidence going to all of the essential elements in this case. In reviewing the trial court's application of the holder-in-due-course doctrine to this case, we agree with the trial court that Kesler paid value for the checks in question. Bauer deposited the checks into Kesler's account as repayment for an existing debt she owed to him. R.C. 1303.33(A)(3) provides that "[a]n instrument is issued or transferred for value if * * * [t]he instrument is issued or transferred as payment of, or as security for, an antecedent claim against any person, whether or not the claim is due."

{¶ 29} Regarding the second holder-in-due-course element of good faith, City Rentals presented no evidence that Kesler lacked good faith when he received the checks. See *Buckeye Check Cashing, Inc., v. Camp,* 159 Ohio App.3d 784, 2005-Ohio-926, 825 N.E.2d 644 (stating that good faith is defined as the absence of bad faith or dishonesty with respect to a party's conduct in a commercial transaction). On the contrary, Kesler's testimony indicates that he was completely unaware that Bauer used City Rentals' checks to make the repayments that she deposited into his accounts.

{¶ 30} We also find that the evidence supported the trial court's decision with respect to the third holder-in-due-course element of notice. In order to prevent one from taking as a holder in due course, notice of claims or defenses of

the person obligated on the instrument must be acquired *at the time of the taking or the time the instrument is transferred* and not subsequently arising thereafter. See 71 Ohio Jurisprudence 3d (2010), Negotiable Instruments and Other Commercial Paper, Section 322. Kesler was consistent in his adamant denial of having any knowledge that Bauer forged the checks she deposited into his accounts at the time she made the repayments. Furthermore, City Rentals presented no evidence at trial to rebut Kesler's testimony. After reviewing the record before us it is evident that City Rentals simply failed to present any evidence to overcome Kesler's defense that he was a holder in due course under these circumstances.

{¶ 31} Moreover, although not mentioned by the parties, the UCC expressly addresses the liability of the employer in a situation, such as this one, in which an employee entrusted with the responsibility of issuing checks on behalf of the employer has committed fraud. R.C. 1303.47 (employer's responsibility for fraudulent endorsement by employee). This particular section adopts the principle that the risk of loss for certain fraudulent conduct by employees who are entrusted with the responsibility with respect to checks should fall on the employer rather than on innocent third parties. The rationale for this position is that "the employer is in a far better position to avoid the loss by care in choosing employees, in supervising them, and in adopting other measures to prevent * * * fraud in the

issuance of instruments in the name of the employer." Official comment to UCC Section 3-405; see R.C. 1303.47. Notwithstanding the above, we acknowledge that Bauer was not a party to this case and that no evidence was presented at trial regarding Bauer's employment with City Rentals other than the fact that she was employed as a bookkeeper for the company.

{¶ 32} Nevertheless, for the reasons discussed above, we find no error in the trial court's decision to dismiss City Rentals' case, having found that its judgment was supported by some competent, credible evidence. Accordingly, City Rentals' second assignment of error is overruled.

### ASSIGNMENT OF ERROR NO. III

The trial court erred as a matter of law by applying the law of conversion in the dismissal of the plaintiffs' case when the plaintiffs' complaint and entire case prayed for relief under the theory of unjust enrichment.

{¶ 33} In its third assignment of error, City Rentals claims that the trial court erroneously applied the law of conversion rather the law of unjust enrichment when it decided to dismiss its case. In raising this assignment of error, City Rentals' obfuscates the trial court's ruling. As previously stated, the trial court relied on the UCC holder-in-due-course doctrine when it dismissed City Rentals' case. A central tenet of the holder-in-due-course doctrine is that the holder in due-course takes the instrument free of claims or defenses made by the obligor, in this case City Rentals.

{¶ 34} Although the trial court in its judgment entry relied on case law shielding a holder in due course from liability on a claim for conversion, the same result is contemplated by the UCC regarding an obligor's claim for unjust enrichment against a holder in due-course. Once a person has demonstrated entitlement to holder-in-due-course status, he is immunized from most of the obligor's claims and defenses, including a claim for unjust enrichment. See *Dice v. White Family Cos., Inc.,* 173 Ohio App.3d 472, 2007-Ohio-5755, 878 N.E.2d 1105, ¶ 61 (stating that "[t]o permit a claim for unjust enrichment when the UCC precludes liability is contrary to the 'delicately balanced statutory scheme' of the UCC"). Accordingly, the trial court's reliance on a case addressing an obligor's claim for conversion is inconsequential to the outcome of this case because the same analysis is used when addressing an obligor's claim for unjust enrichment against a holder in due course. As a result, we find no error in the trial court's decision to dismiss City Rentals' case on this basis.

{¶ 35} Finally, in upholding the judgment of the trial court we are reminded of the following. "[T]he Uniform Commercial Code is a delicately balanced statutory scheme designed, in principle, to ultimately shift the loss occasioned by negotiation of a forged instrument to the party bearing the responsibility for the loss. Ideally, the thief is held accountable. The unfortunate reality is that the loss is often shifted to the innocent party whose conduct or relationship with the forger

most facilitated the risk of loss." *Ed Stinn Chevrolet, Inc. v. Natl. City Bank* (1986), 28 Ohio St.3d 221, 226, 503 N.E.2d 524.

**{¶ 36}** With this in mind, we overrule City Rentals' third assignment of error.

**{¶ 37}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

Judgment affirmed.

WILLAMOWSKI, P.J., concurs.

ROGERS, J., concurs in judgment only.